UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Victoria McCartney; Shane McCartney;
Guerrilla Entertainment LLC,
d/b/a Midwest Drone Racing,

       Plaintiffs,

v.

City of
Welcome; Welcome Historical Society,

       Defendants.

**MEMORAMDUM OF LAW &**
**ORDER**
Civil File No. 25-02245 (MJD/DJF)

Elizabeth A. Nielsen, Erick G. Kaardal, Mohrman, Kaardal & Erickson, P.A.,
Counsel for Plaintiffs.

Gregory E. Kuderer, Robert E. Kuderer, Erickson Zierke Kuderer & Madsen PA,
Counsel for Defendant Welcome Historical Society.

## I.    INTRODUCTION

Before the Court is Defendant Welcome Historical Society ("WHS")'s

Motion to Dismiss. (Doc. 37.) For the reasons stated below, the Court grants

WHS's Motion to Dismiss.

## II.    BACKGROUND

The following facts are relevant to WHS's motion to dismiss. The Court

takes all facts alleged in the Amended Complaint as true. Zutz v. Nelson, 601

F.3d 842, 848 (8th Cir. 2010).

1

### A. Plaintiffs' Relationship with the Welcome Historical Society

Plaintiffs Shane and Victoria McCartney have resided in Welcome, a city in Martin County, Minnesota, for about five years.  (Doc. 4 ¶ 13.)  Soon after they moved to the area, Plaintiffs decided to participate in a partially-government-sponsored program called "Going Hog Wild in Martin County," which distributes "dozens of artistically painted cement pigs throughout the county as a promotion of Martin County."  (Id. ¶¶ 14, 17-18.)  Martin County is the number one hog-producing county in Minnesota and the sixth-largest hog producer in the country.  (Id. ¶ 16.)  The "Going Hog Wild in Martin County" event is "dedicated to celebrating and enhancing the unique charm of our community by spotlighting local businesses, artists, and the vibrant pork community." (Id. ¶ 46.) Plaintiffs wanted to participate in the program to support the community and to promote their new Midwest Drone Racing business.  (Id. ¶ 15.)

To participate in the program, Plaintiffs offered a pig statue as a donation to WHS. (Id. ¶ 51.)  WHS is a section 501(c)(3) charitable organization in the City of Welcome that operates as a museum. (Id. ¶¶ 40–43). Plaintiffs volunteered for WHS in the past and joined as members in 2021. (Id. ¶¶ 36–37.) Plaintiffs specifically offered the pig statue to WHS to be placed at the museum entrance. (Id. ¶ 51.)

**B. Plaintiffs' Pig Statue Donation to the Welcome Historical Society**

Plaintiffs decided to donate a $2,400 pig statue to WHS. (Id. ¶ 19.) At the March 2022 WHS Board Meeting, Plaintiffs' gift of a pig statue, to be located at the WHS Museum entrance, was unanimously accepted.  (Id. ¶ 52.)  Thereafter, Plaintiffs spent approximately $2,400 on a cement pig and custom-designed artwork for the pig that was to be located at the WHS museum entrance.  (Id. ¶¶ 54-56, 70.)

However, on May 19, 2022, one week before the scheduled public unveiling of the pig statues in Fairmont, Minnesota, Plaintiffs received an email from the WHS Clerk/Treasurer that stated the City of Welcome ("the City") owned the building that the WHS Museum occupied, and that the Welcome City Council had met the previous night and decided that it did not want Plaintiffs' pig placed at WHS.  (Id. ¶¶ 60–61.)  The WHS Clerk/Treasurer then informed Plaintiffs that they would have to find another location for their pig.  (Id.)

Plaintiffs were "completely dumbfounded by this news" and noted that they had no idea the City of Welcome had anything to do with their pig statue donation. (Id. ¶¶ 66–67.) Plaintiffs met with the WHS president shortly after receiving the email, and the president stated the WHS "was not willing to 'bite

3

the hand that feeds them' since the City of Welcome owns the building WHS

occupies, and the City of Welcome pays the utilities for WHS."  (Id. ¶¶ 71–72.)

Plaintiffs never believed they needed the City's approval to place a pig at

the WHS Museum because they had previously purchased and installed new

front doors for the WHS, with a $1,000 donation from Plaintiff Victoria's

employer, without the City of Welcome's approval.  (Id. ¶¶ 38, 81–82.)

### C. Plaintiffs' Communications with WHS After WHS's Rejection of the Pig Statue

Following the conversation with WHS's president, Plaintiffs sent a

certified letter three separate times to WHS.  (Id. ¶ 74.) Plaintiffs did not provide

the content of these three letters. However, Plaintiffs filed as an attachment the

only response they received, which was from the Edman & Edman law firm

hired by the City of Welcome and WHS. (Id. ¶ 75.) The letter, dated September

16, 2022, indicated that the location of WHS is on City-owned property, and the

City determined it does not want the pig at the location. (Doc. 4-4.) The letter also

stated that the City of Welcome's decision was "not negotiable, and not

something that [WHS] can override." (Id.)

Plaintiffs also stated that upon reviewing the Welcome City Council

minutes from July 19, 2022, the City Council noted that "[Plaintiffs] can place his

pig in the City of Welcome, but not on City property." (Doc. 4 ¶ 77 (quoting July 19, 2022 City Council minutes).) Plaintiffs were not notified of this meeting, were not in attendance, and did not know why this issue was discussed at the meeting. (Id. ¶¶ 77–79.)

Plaintiffs assert that they did not believe they needed the City's approval to place a pig at WHS following WHS's unanimous vote. (Id. ¶ 81.) Plaintiffs argue this was not their understanding, particularly because WHS had 1) replaced the museum doors, and 2) placed a bench at WHS to honor a WHS employee, both without City approval. (Id. ¶¶ 82–83.)

While not immediately clear from the pleadings, Plaintiffs' pig was, in fact, on display at the "Going Hog Wild" unveiling event on May 26, 2022. (Doc. 49.) However, Plaintiffs' counsel indicated that "on that day, Ziggy the pig was homeless and would not be placed at the WHS as agreed-to." (Id.)

Plaintiffs' pig was also later displayed in Martin County, including outside the Loxley Coffee establishment, located in Fairmont. (Doc. 40-3.)

**D. Plaintiffs' Claims**

Plaintiffs assert three claims against Defendant WHS. First, Plaintiffs assert that WHS and the City of Welcome violated their Procedural Due Process Rights (Count VII). (Doc. 4 ¶¶ 255–68.) Specifically, Plaintiffs assert that WHS had

5

agreed to accept the pig donation, and that when the City of Welcome alerted Plaintiffs that they would not accept the pig donation without a hearing or notice, Plaintiffs were deprived of their procedural due process rights. (Id. ¶¶ 256–63.) As part of this argument, Plaintiffs maintain that they had a property interest in the cement pig after WHS accepted the donation. (Id. ¶ 258.) Plaintiffs also state that they suffered nominal, general, and special damages as a result of this deprivation in the form of "lost income, reputational loss, emotional distress, shame and humiliation." (Id. ¶ 267.)

Second, Plaintiffs assert that WHS breached their contract with Plaintiffs (Count VIII). (Id. ¶¶ 269–74.) To plead this claim, Plaintiffs argue that WHS agreed to accept the pig donation, Plaintiffs spent money purchasing/designing the pig, and WHS then breached by refusing to accept delivery of the pig. (Id. ¶¶ 270–272.) Plaintiffs plead the same damages as in their procedural due process claim. (Id. ¶ 273.)

Third, Plaintiffs bring a claim for promissory estoppel (Count IX) against WHS. (Id. ¶¶ 275–80.) Plaintiffs assert that WHS promised to accept the pig donation from Plaintiffs, and Plaintiffs relied to their detriment on that promise by spending $2,400 out-of-pocket. (Id. ¶¶ 276–77.) Plaintiffs plead the same

damages as their procedural due process and breach of contract claims. (Id. ¶ 279.)

## III.   DISCUSSION

Welcome Historical Society seeks to dismiss all three claims Plaintiff brought against it (Count VII, Count VIII, and Count IX).

### A. Rule 12(b)(6) Legal Standard for Motion to Dismiss

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move the Court to dismiss a claim if, on the pleadings, a party has failed to state a claim upon which relief may be granted.  In reviewing a motion to dismiss, the Court takes all facts alleged in the complaint to be true.  Bell Atl. Corp v. Twombly, 550 U.S. 544, 555-56 (2007); Zutz, 601 F.3d at 848.  However,

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  Thus, although a complaint need not include detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

Zutz, 601 F.3d at 848 (citations omitted); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

7

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). Thus, the Court "need not accept as true a plaintiff's conclusory allegations or legal conclusions drawn from the facts." Glick v. W. Power Sports, Inc., 944 F.3d 714, 717 (8th Cir. 2019) (citation omitted).

Generally, when considering a motion to dismiss, a court must ignore materials outside of the pleadings. Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999). However, the court may consider some materials that are 1) "part of the public record," 2) "do not contradict the complaint," or 3) are "necessarily embraced by the pleadings." Id. (quotations omitted) (citing Missouri ex rel. Nixon v. Coeur D'Alene Tribe, 164 F.3d 1102, 1107 (8th Cir. 1999); Piper Jaffray Cos. v. Nat'l Union Fire Ins. Co., 967 F. Supp. 1148, 1152 (D. Minn. 1997)).

### B.   Procedural Due Process Claim (Count VII)

In their Amended Complaint, Plaintiffs assert that WHS violated their Fourteenth Amendment Due Process rights by not providing them with a hearing prior to making a decision about the cement pig, which resulted in the loss of their property interest in the donation of the statue. (Doc. 4 ¶¶ 259–60.)

WHS argues in their motion to dismiss that 1) it is not a state actor and is therefore excluded from liability; 2) Plaintiffs did not have a property interest in having their pig displayed at WHS; 3) Plaintiffs were not owed any "process" from WHS; and 4) Plaintiffs were not deprived of any property interest. (Doc. 39 at 13–24.)

### 1. State Action Doctrine

The Due Process Clause of the Fourteenth Amendment provides, in pertinent part, that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. The Fourteenth Amendment's protections extend only to state actions, not private conduct. See Jackson v. Metro. Edison Co., 419 U.S. 345, 350 (1974).

To determine if there is state action, the record must identify conduct that is "fairly attributable" to the state. Montano v. Hedgepeth, 120 F.3d 844, 848 (8th Cir. 1997) (quoting Lugar v. Edmondson Oil Co., 457 U.S. at 937). Whether a private entity may be appropriately characterized as a state actor is "a matter of normative judgment, and the criteria lack rigid simplicity." Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001). Still, the Court has identified certain circumstances where private conduct is "fairly attributable

to the state," such as when there is such a "'close nexus between the State and the challenged action" that seemingly private behavior 'may be fairly treated as that of the State itself.'" Id. (citing Jackson, 419 U.S. at 351).

Plaintiffs argue a close nexus existed between WHS and the City under three theories: 1) coercive control; 2) pervasive entwinement; and 3) symbiotic relationship. (Doc. 43 at 10–14.) None of Plaintiffs' state action theories persuade the Court.

### a. Coercive Control

A challenged activity may be state action when it results from the State's exercise of "coercive power," meaning when a State demonstrates "significant encouragement, either overt or covert" over a private entity. Brentwood Acad., 531 U.S. at 296 (citing Blum v. Yaretsky, 457 U.S. 991, 1004 (1982)). Plaintiffs argue that the City exercised "coercive control" over WHS by prohibiting placement of the pig at WHS despite WHS's previous acceptance of the pig. (Doc. 43 at 11–12.) WHS maintains, however, that Plaintiffs alleged no facts to suggest that the City coerced WHS into declining the pig statue (e.g., the City did not threaten to evict them, did not threaten to cut off utilities, etc.). (Doc. 44 at 5.)

10

As an initial matter, while not directly addressed in Eighth Circuit case law, the coercive control theory appears mostly as a mechanism to hold the state accountable for private actions, not the other way around. See Flagg Bros. v. Brooks, 436 U.S. 149, 164 (1978) ("Our cases state 'that a State is responsible for the . . . act of a private party when the State, by its law, has compelled the act.'") (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 170 (1970)); see also Blum, 457 U.S. at 1004 (holding that "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State") (emphasis added).

In any event, the level of coercion required to find coercion that amounts to state action is substantial. The Supreme Court has indicated that to state a claim that the government violated the Constitution through coercion of a third party, a plaintiff must allege conduct that "could be reasonably understood to convey a threat of adverse government action." Nat'l Rifle Ass'n of Am. v. Vullo, 602 U.S. 175, 191 (2024). For instance, in U.S. v. Stein, the Second Circuit found that the actions of an accounting firm amounted to state action under a coercion theory. 541 F.3d 130 (2d Cir. 2008). In Stein, an accounting firm adopted a

11

Department of Justice policy regarding the payment of legal fees. Id. at 147.  The

Stein court found that the government had put significant pressure on the

accounting firm to adopt the policy, indicating that "[the firm's] survival

depended on its role in a joint project with the government to advance

government prosecutions." Id. The government also assisted in the enforcement

of the accounting firm's policy, intervened in the firm's decision making, and

supervised individual cases, to the point where "prosecutors became 'entwined

in the control . . .' of the [firm]." Id. at 148 (citing Flagg, 396 F.3d at 187).

By contrast, in Blum, the Supreme Court rejected a coercion theory of state

action despite extensive state regulation. See 457 U.S. 991. In Blum, a class of

Medicaid patients attempted to challenge the transfer/discharge decisions of

private nursing homes. Id. at 994–98. The patients sought to attribute the actions

to New York state, pointing to state regulations that encouraged certain transfer

decisions and imposed penalties on nursing homes that failed to abide by the

transfer/discharge regulations. Id. at 1007–09. The Court emphasized that state

regulation, even with penalties attached, does not necessarily establish the

required coercion to attribute private conduct to the state. Id. at 1010–11.

12

There is no evidence in the record that the City coerced WHS into rejecting Plaintiffs' pig. Plaintiffs' theory appears to rest not on threats or penalties, but on the City's instruction that WHS could not display the pig on City-owned property. However, the relevant inquiry for coercion focuses on a "threat of adverse government action," as opposed to mere government regulation/instruction, of which, Plaintiffs allege no facts. For instance, Plaintiffs do not allege that WHS faced any potential consequence for noncompliance: Plaintiffs do not indicate that the City threatened WHS with eviction, termination of its lease, loss of utilities, or any other adverse government action if it displayed the pig.

Instead, Plaintiffs' argument appears largely to rely on WHS's statement that it did not want to "bite the hand" that feeds it. (Doc. 43 at 11–12.) Such a statement may indicate a fear of consequence for noncompliance, but one of WHS's own making. Plaintiffs even later concede that "nothing in the pleadings supports that the City would actually turn against WHS had WHS allowed the pig delivery and display to happen as planned." (Doc. 43 at 19.)

Absent any plausible allegation of threatened adverse consequence, the Court concludes that the City's conduct cannot be understood as coercive so as to support a finding of state action.

### b. Pervasive Entwinement

A private party may be characterized as a state actor where there is "pervasive entwinement"[1] between the private entity and the state. See Wickersham v. City of Columbia, 481 F.3d 591, 597 (8th Cir. 2007). Although no single factor is dispositive, "pervasive entwinement," exists where the government is significantly entwined with the management or control of the private entity. See Brentwood Acad. , 531 U.S. at 296 (citing Evans v. Newton, 382 U.S. 296, 299 (1966)); see also Americans United for Separation of Church & State v. Prison Fellowship Ministries, Inc., 509 F.3d 406, 421 (8th Cir. 2007)

---

[1] The "pervasive entwinement" test is sometimes referred to as the "joint action" test. See Wickersham, 481 F.3d at 598–99 (applying joint action and entwinement Supreme Court cases in the same analysis); see also Loe v. Jett, 796 F. Supp. 3d 541, 562–65 (D. Minn. 2025) (referring to "joint-action/entwinement" test to analyze alleged state action). The actual distinction between tests is not what is important; instead, what matters is that there "be a close nexus not merely between the state and the private party, but between the state and the alleged deprivation itself." Meier v. City of St. Louis, 934 F.3d 824, 829 (8th Cir. 2019) (quoting Wickersham v. City of Columbia, 481 F.3d 591, 597 (8th Cir. 2007) (cleaned up)). The tests themselves merely provide factual comparisons to reach such conclusion.

(holding that "[i]n certain circumstances the government may become so entangled in private conduct that 'the deed of an ostensibly private organization or individual is to be treated . . . as if a State had caused it to be performed")  (quoting Wickersham, 481 F.3d at 597). But "mere regulation" as "a precondition for the receipt of public funds . . . does not convert a private organization's actions into state action . . . 'even if the regulation is extensive and detailed.'" Sabri v. Whittier All., 833 F.3d 995, 1000 (8th Cir. 2016) (quoting Rendell–Baker v. Kohn, 457 U.S. 830, 841 (1982)) (cleaned up).

Plaintiffs argue that the "City's authority over WHS operations and displays" demonstrates such entwinement. (Doc. 43 at 12.) WHS disputes this characterization, maintaining that there is no contractual relationship between WHS and the City, no joint planning/coordinating between the two entities, and no day-to-day oversight by the City. (Doc. 44 at 7.)

Governing precedent supports WHS's position. For instance, in Brentwood Acad., the Supreme Court examined whether a high school interscholastic athletic association was sufficiently intertwined with public institutions and public officials so as to make it a "state actor." See 531 U.S. at 290. The Court determined that the association was, in fact, a state actor because 84% of the

15

association's membership was constituted of public schools and school faculty/administrators made up the association's leadership. Id. at 299–300.

Along a similar vein, the Eighth Circuit found state action in Wickersham where a nonprofit corporation, Salute, worked closely with the City of Columbia to host a Veterans Day airshow at the city-owned airport. See 481 F.3d at 593–94. In Wickersham, the City of Columbia provided police officers as security for the event, which included prohibiting protesters from demonstrating at the airshow. Id. at 594. Police arrested two demonstrators, who sued Salute and the City of Columbia on First Amendment grounds. Id. at 595.

The Eighth Circuit determined that Salute was acting as a state actor when it interfered with the demonstrators. Id. at 599. Specifically, the Court noted that the City's involvement with Salute went far beyond "mere acquiescence": the City played an active role in enforcing the speech regulations and provided substantial assistance in planning the airshow in the first place. Id. at 598–99. Therefore, Salute and the City of Columbia were "knowingly and pervasively entangled in the enforcement of the challenged speech restrictions." Id. at 599.

The circumstances here differ significantly from the circumstances in the precedent cases. Plaintiffs do not plead facts showing that the City is involved in

16

WHS's management or control. There is no indication that City officials serve on WHS's board, that the City participates in WHS's day-to-day operations, or that the parties jointly plan or coordinate activities. Absent such allegations, the level of integration between the two entities is not plausibly established.

Further still, the landlord/tenant relationship is not likely enough on its own to establish the kind of significant entanglement required for the state action doctrine. In Lubin v. Crittenden Hosp. Ass'n, the Eighth Circuit considered whether a private hospital's disciplinary action against an employee could constitute state action under § 1983. 713 F.2d 414, 415 (8th Cir. 1983). Crittenden Hospital operated as a private non-profit entity organized under the laws of Arkansas and was located on county land in a building owned by the county. Id. The Eighth Circuit noted that public ownership of the property "[was] not significant" at least because the lease afforded "full and complete charge of the management and operation" to the hospital. Id. at 416.

Here, the facts as pled do not indicate that any special landlord/tenant relationship exists between WHS and the City. While Plaintiffs' counsel indicated in oral argument that "no lease agreement has been . . . produced," Plaintiffs' own allegations still suggest even less entwinement than was present in Lubin.

17

Plaintiffs concede that that "WHS purchased and installed the doors without the landlord City's approval." (Doc. 4 ¶ 38.) Such an undertaking only further cuts against Plaintiffs' argument because it indicates a complete lack of day-to-day management from the City over WHS and its use of the property.

### c. Symbiotic Relationship

Finally, a "symbiotic relationship"[2] between a State and a private entity justifies a finding of state action. See Burton v. Wilmington Parking Auth., 365 U.S. 715 (1961). The "symbiotic relationship" test asks whether the state is so significantly involved with the activities of a private entity that the private entity's conduct can be attributed to the government itself. See Gilbreath v. E. Ark. Plan. & Dev. Dist., Inc., 471 F. Supp. 912, 922 (E.D. Ark. 1979). Plaintiffs acknowledge that their symbiotic relationship argument is "closely related" to their entwinement theory, once again pointing to the City's "control of [WHS's]

---

[2] Like the "pervasive entwinement" test, the "symbiotic relationship" discussed in Burton has been referred to as the "joint participation test." American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 57 (1999) ("Burton was one of our early cases dealing with "state action" under the Fourteenth Amendment, and later cases have refined the vague "joint participation" test embodied in that case."). The blurred lines between the tests themselves merely reinforce that no one theory/test is dispositive; state action is a "necessarily fact-bound" analysis. See Lugar, 457 U.S. at 939.

display" and arguing that the City pays WHS's utilities. (Doc. 43 at 12–13.) WHS disputes these allegations, stating that "there is nothing suggesting the City [] funded construction, repairs, or interior improvements for WHS." (Doc. 44 at 9.)

The Supreme Court first announced the "symbiotic relationship" test in Burton v. Wilmington Parking Auth., in response to a parking authority that leased space to a private restaurant. 365 U.S. at 718. The restaurant denied service to a customer because of that person's race. Id. at 716. In concluding that there was a "symbiotic relationship" between the city and the restaurant, the Court emphasized the mutually beneficial relationship between the government and the restaurant: the government benefitted from the revenue of the restaurant and the government, in turn, had "elected to place its power, property, and prestige behind the admitted discrimination." Id. at 724–25. The decision rested on the degree of mutual benefit between the two entities, emphasizing the financial benefit and the state's implicit endorsement of the challenged conduct.

Subsequent decisions of the Supreme Court and Eighth Circuit have narrowed Burton's reach. The Eighth Circuit has indicated that Burton's symbiotic relationship test is "limited generally to cases involving racial discrimination." See Lubin, 713 F.2d at 416. Moreover, since Burton was decided,

"the Supreme Court has retreated . . . from its holding." <u>See</u> <u>Sabri v. Whittier All.</u>,

122 F. Supp. 3d 829, 839 (D. Minn. 2015), <u>aff'd</u>, 833 F.3d 995 (8th Cir. 2016). The

Supreme Court has clarified that <u>Burton</u> was an early, expansive theory of state

action that has since been refined:

> <u>Burton</u> was one of our early cases dealing with "state action" under the
> Fourteenth Amendment, and later cases have refined the vague "joint
> participation" test embodied in that case. <u>Blum</u> and <u>Jackson</u>, in particular,
> have established that <u>privately owned enterprises providing services that
> the State would not necessarily provide</u>, even though they are extensively
> regulated, <u>do not fall within the ambit of</u> <u>Burton</u>.

<u>American Mfrs. Mut. Ins. Co. v. Sullivan</u>, 526 U.S. 40, 57 (1999) (internal citations

omitted) (emphasis added).

This clarification of the "symbiotic relationship" doctrine is particularly

relevant here. WHS is a charitable organization that operates a museum

celebrating the history of the City of Welcome. (Doc. 39 at 5.) WHS is not a public

entity providing services that are traditionally governmental in nature. Further,

running a small city historical society is not even an "extensively regulated

service."

Even assuming the <u>Burton</u> symbiotic relationship test for state action is

fully intact, Plaintiffs cannot prevail. There are no allegations of a mutually

beneficial relationship between the City and WHS beyond the traditional

20

landlord-tenant arrangement. At most, Plaintiffs allege that WHS operates on City-owned property and may receive incidental benefits such as utilities. But without more, the facts do not establish the kind of "symbiotic relationship" contemplated in Burton.

In sum, across the various state-action frameworks that Plaintiffs allege–coercion, entwinement, and symbiotic relationships – Plaintiffs fail to plausibly plead facts showing that the City meaningfully controlled, compelled, or was responsible for WHS's decision. At most, the allegations indicate that the City, acting as a property owner, placed a limitation on the use of its property, and that WHS complied with that limitation of its own free will. Under binding precedent, such circumstances are insufficient to transform a private entity's conduct into state action.

### 2. State Action Doctrine at the Motion to Dismiss Stage

It is worth noting that the Court, on its own initiative, has identified some cases in the District of Minnesota in which the court has stated that determining whether parties are state actors is not appropriate at the motion to dismiss stage. See Roe v. N. Homes, Inc., No. CV 18-3428 (PAM/LIB), 2019 WL 2296876, at *2 (D. Minn. May 30, 2019) ("[W]hether Defendants were state actors is

inappropriate for resolution on a motion to dismiss."); Loe v. Jett, No. 23-CV-1537) (NEB/JFD) (D. Minn. March 18, 2024) ("The Court declines to resolve this fact-intensive issue on a motion to dismiss because the parties have not yet had an opportunity to develop the factual record through discovery."). As these decisions point out, the reason for declining to dismiss the action at this stage is because such determination is a "necessarily fact-bound inquiry." See Lugar, 457 U.S. at 939.

However, dismissing a claim based on a lack of state action is not always disfavored. In Magee v. Trs. of the Hamline Univ, Judge Tunheim adopted a report and recommendation, recommending dismissal of claims brought by a law professor at Hamline University School of Law against the dean and a St. Paul police officer. 957 F. Supp. 2d 1047, 1053 (D. Minn. 2013). The Court determined at the motion to dismiss stage that the Hamline defendants and police officers were not "state actors." See id. at 1059 ("[the Plaintiff's] proposed amended complaint does not contain sufficient factual allegations to state a § 1983 claim against [police officer], because he was not acting under color of state law at the time of the alleged constitutional violations."). This decision was later affirmed by the Eighth Circuit. See Magee v. Trs. of Hamline Univ., 747 F.3d 532,

22

535 (8th Cir. 2014) (stating that the plaintiff failed to plausibly plead sufficient facts that the university officials or police officer were state actors).

Further, neither party even argued that it is inappropriate for the Court to consider whether WHS is a state actor at this stage. The closest Plaintiffs' counsel came to making this argument was pointing out during oral argument that the parties are "in the middle of discovery" and that no lease agreement had been produced, although such comments were not tied to an argument about whether the Court could presently consider the question. Instead, the parties spend a combined 13 pages of briefing on the state action doctrine question alone.

Therefore, because this analysis is not necessarily precluded at this stage, the parties briefed the issue, and no party argued otherwise, the Court concludes it is appropriate to review the state action doctrine question under these circumstances and considers any argument to the contrary waived.

Accordingly, because the Fourteenth Amendment's due process protections can only be violated by conduct fairly characterized as "state action," not private conduct, and Plaintiffs failed to plausibly plead that WHS is a state actor, Plaintiffs' Procedural Due Process claim (Count VII) must be dismissed.

### C. Breach of Contract Claim (Count VIII) and Promissory Estoppel Claim (Count IX)

Plaintiffs also raised both a state law breach of contract claim and a state law promissory estoppel claim against WHS. (Doc. 4 ¶¶ 269–280.) While WHS argues that these claims should similarly be dismissed, the Court need not address these arguments at all.

Under 28 U.S.C. § 1367(c)(3), the Court may decline to exercise supplemental jurisdiction over a state law claim if the district court has "dismissed all claims over which it has original jurisdiction." See, 601 F.3d 842, 850 (8th Cir. 2010). In such circumstance, the Court's discretion to decline to exercise supplemental jurisdiction "is very broad." Brown v. Mortg. Elec. Registration Sys., Inc., 738 F.3d 926, 933 (8th Cir. 2013). In considering dismissal of state law claims, the district court is instructed to consider "factors such as judicial economy, convenience, fairness, and comity." Id.

Here, it is in the interest of the parties for a Minnesota state court to resolve state claims involving Minnesota parties. See, e.g., Elmore v. Harbor Freight Tools USA, Inc., 844 F.3d 764, 767 (8th Cir. 2016) (affirming district court's dismissal of state law claims after determining that "a Missouri state court should resolve state claims involving Missouri residents and that it would

be more fair and convenient to allow a Missouri state court to hear these claims.").

Accordingly, the Court declines to consider Plaintiffs' state law claims for breach of contract (Count VIII) and promissory estoppel (Count IX) against WHS.

## IV.   ORDER

Based on the foregoing reasons, as well as the files, records, and proceedings herein, **IT IS HEREBY ORDERED:**

1.    Defendant Welcome Historical Society's Motion to Dismiss **[Doc. 37]** is **GRANTED**; and

2.    Claims VII, VIII, and IX of the Amended Complaint are **DISMISSED with prejudice**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:   June 10, 2026           s/Michael J. Davis
                                 Michael J. Davis
                                 United States District Court

25